[Cite as *In re Guardianship of Waters*, 2013-Ohio-4132.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY


IN THE MATTER OF:             :

                                          CASE NO. CA2012-04-035
     THE GUARDIANSHIP OF     :
     JULIA WATERS                           O P I N I O N
                                :         9/23/2013

                                :

                                :


APPEAL FROM WARREN COUNTY COURT OF COMMON PLEAS
PROBATE DIVISION
Case No. 2011 2031


Gray and Duning, John C. Kaspar, 130 East Mulberry Street, Lebanon, Ohio 45036, for Respondent-Appellant, Julia Waters

Carol Garner-Stark, 9435 Waterstone Boulevard, Suite #140, Cincinnati, Ohio 45249, for Petitioners-Appellees, Lisa Frye and Gretchen Gibbons-Black, Co-Guardians


     **FAIN, J.**

     **{¶ 1}** Julia Waters appeals from an order of the trial court finding her incompetent, and appointing co-guardians of her person. The order is not against the manifest weight of the evidence. Nor did the trial court err in declining to find that a less restrictive alternative to the guardianship exists. Accordingly, the order of the trial court from which this appeal is taken is affirmed.

## I. Facts Established at Guardianship Hearing

**{¶ 2}** Waters had lived in Trinity Manor, an independent living facility in Middletown, Ohio, for about five years. At some point, she sustained a hip fracture while living there, as a result of which she was treated at the Atrium Medical Center in January 2011. When she was discharged from the hospital, she was taken to The Cedars of Lebanon, an assisted living center in Lebanon, Ohio. She did not like being at The Cedars and wanted to return to her apartment at Trinity Manor. At the time of the guardianship hearing, in August and October 2011, Waters had been paying her rent at Trinity Manor, hoping to return, but was still at The Cedars.

**{¶ 3}** In its Judgment Entry overruling objections to the magistrate's decision and adopting that decision as the order of the trial court, the trial court found the following facts:

> In the case sub judice, the Application for Appointment of Guardian stated that [Waters] is incompetent by reason of dementia. The Statement of Expert Evaluation filed on April 19, 2011 was completed by Dr. [Rakesh M.] Kaneria at Atrium Medical Center. The evaluation stated [Waters] is mentally impaired as a result of a psychosis and dementia diagnoses. Said Evaluation was completed on January 11, 2011 and the parties stipulated to the report being admitted into evidence at trial. * * * Dr. Kaneria noted in the evaluation that [Waters] was disoriented, physically impaired,[1] paranoid, and incapable of caring for herself on a daily basis. In conclusion, Dr. Kaneria recommended that a guardianship be established. [Waters'] objection questions the reliability of Dr. Kaneria's expert evaluation alleging [Waters] was under the influence of hydrocodone while the evaluation was being administered. Dr. Kaneria's evaluation was completed on January 11, 2011, not April 19, 2011 as proposed by [Waters]. The evaluation specifies that [Waters] was not under the influence of hydrocodone[2] and that none of her medications at the time would have cause[d] mental impairments. There is no evidence

---

1. Waters was hospitalized as a result of a hip fracture, which had completely healed at the time of the guardianship hearing.

2. Dr. Kaneria's evaluation does not list hydrocodone as one of the medications Waters was under at the time, and does not otherwise mention hydrocodone.

that causes the Court to question the validity of the Expert Evaluation.

Though the Expert Evaluation was completed nine months before trial, Dr. Kaneria's findings were later corroborated by the Investigator's Report and trial testimony. In the Court Investigator's Report filed on May 25, 2011, Ms. Lewis stated [Waters] is incapable of handling her own finances, preparing her meals, and driving. Also, [Waters] is on numerous medications which she is unable to administer herself. Ms. Lewis noted [Waters] has impaired memory and judgment skills. Ms. Lewis interviewed [Waters'] brother and sister who both claim [Waters] suffers from a long-term mental illness. During the last couple years, [Waters] has fractured her wrists[3] and hip. She refused elderly services offered by Adult Protective Services and would not submit to psychiatric treatment at Cedars [of Lebanon]. Based upon the foregoing, Ms. Lewis found a guardianship of the person was necessary. [Footnote omitted.]

All of the health professionals at Cedars, who have assisted in [Waters'] care over the past nine months, testified [Waters] is unable to take proper care of herself. While [Waters] presented two witnesses who testified as to her ability to live independently, neither has interacted with [Respondent] over the course of the past year. Nor does their testimony align with the pictures of [Waters'] apartment that were submitted into evidence by Petitioner. The condition of [Waters'] apartment shown in Plaintiff's [sic] Exhibits 1-12 reveals the residence is cluttered, unclean, and full of empty pizza boxes. Given [Waters'] history of paranoia and psychosis, the Court finds [Waters'] accusation that her relatives are responsible for her apartment's disarray to be unfounded.

The most telling evidence of [Waters'] mental health condition and paranoia was her eccentric and somewhat incomprehensible testimony at the October 4, 2011 trial.[4] [Waters] was oriented regarding the date and location of the hearing, but her testimony was often unresponsive to questions. When asked if she wanted the court to deny the guardianship, [Waters] replied, "Oh definitely because those people in that building, we have wristbands on. They had a wristband on here when I hurt it like Martha Stewart wristband."

---

3. We have only found evidence in the record that Waters sustained the fracture of *one* wrist during that time.

4. The hearing before the magistrate was conducted on August 9, 2011, and October 4, 2011. Waters testified on October 4, 2011.

* * * . [Waters] was offered physical therapy and stated she would accept it now if she could return to Trinity Manor, because in the past she "was always willing, I just couldn't present yourself without your social security card and that was stolen when I went with my preacher." * * * . When asked which bank her money was in, she responded, "Fifth Third, but they're saying they're going to take our bank accounts, move them to another state. Leave us with thirty dollars a month and this new company came from overseas so they have Cedars of Lebanon and Cedarview [Health Care and Rehab, which is affiliated with The Cedars of Lebanon] and they say that they take everything from us. We'll live on thirty dollars a month." * * * .

[Waters'] objection contends that her physical ailments have healed to the extent she no longer is in need of full-time care and is ready to leave Cedars. The Court does not contest that the hip injury which originally brought [Waters] to Cedars has subsided. However, the Court concludes [Waters] suffers from psychosis, paranoia, dementia, and physical infirmity. As a result of these irreversible diagnoses,[5] [Waters] is no longer able to properly care for herself. Based upon the testimony presented, the Expert Evaluation, and the Investigator's Report, the Court finds by clear and convincing evidence that [Waters] is an incompetent person.

* * *

[Waters'] objection contends that a guardianship is not necessary because she is able to dress and feed herself. She argues she is capable of handling her finances because she has continued to pay her rent to Trinity Manor. Thus, [Waters] believes returning to Trinity Manor without a guardianship in place is a practical less restrictive alternative, because she can apply for assisted living services that would satisfy her need for around the clock care. However, numerous witnesses testified at trial regarding [Waters'] tendency to refuse services and therapy.

[Waters] argues that her prior history of declining elderly services and therapy implies that she is stubborn, not in need of a guardian. Yet, over the course of the past few years, [Waters] has repeatedly failed to act in her own best interest. For example, the Investigator's Report states [Waters] walked around her apartment for days with a fractured hip before

---

5. In the prognosis section of his expert evaluation, Dr. Kaneria checked the "no" box to the question: "Is the condition reversible."

calling for medical assistance. She also refused physical therapy in 2011 to help her heal her broken wrist and was sleeping on the floor at her old apartment. [Waters] refuses to take her mental health medications at times because she is convinced she has been misdiagnosed. * * * These decisions do not indicate [Waters] is stubborn, rather they exhibit [Waters'] extreme disregard for her own health and safety.

After careful consideration, the Court concludes returning to Trinity Manor is not a suitable alternative for [Waters]. At this time, she is in need of full time professional care and assistance with her medical decisions. [Waters'] objection declares she is willing to employ similar resources to facilitate her own full time care at Trinity Manor. However, she has had multiple opportunities in the past to do so and failed to take advantage of services offered to her. Without a guardianship of the person in place, [Waters] may very well refuse to cooperate and choose to resort back to her previous lifestyle. Also, due to the lack of involvement by [Waters'] family, no other viable alternative exists. The Court finds a guardianship of the person of [Waters] is reasonable, necessary, and in her best interest.

{¶ 4} We have reviewed the record, including the transcripts of the hearings before the magistrate, Dr. Kaneria's expert evaluation, the special investigator's report, and the twelve photographs admitted in evidence at the hearing. We conclude that, with the exceptions noted above in the footnotes to this opinion, the evidence in the record supports the trial court's findings of fact.

## II. The Course of Proceedings

{¶ 5} Ryan Insprucker, Kara Frederick, Amy Spears, and Lisa Lucas, of LifeSpan, Inc., have applied to be co-guardians of the person of the Respondent, Julia Waters. There is no application for a guardianship of her estate.

{¶ 6} The application, opposed by Waters, was heard before a magistrate on two dates, August 9 and October 4, 2011. At the conclusion of the hearing, the magistrate approved the application, found Waters to be incompetent, and appointed the Petitioners as co-guardians of Waters' person. The trial court immediately adopted the magistrate's

decision, subject to objection. Waters objected, contending that the evidence did not support a finding that she was incompetent and, in the alternative, that her return to Trinity Manor, with around-the-clock services, was a suitable, less restrictive alternative, rendering the establishment of a guardianship unnecessary.

{¶ 7} The trial court overruled Waters' objection, and entered a Judgment Entry adopting the decision of the magistrate as the order of the trial court. From the guardianship order, Waters appeals.

### III. The Guardianship Order Is Not Against the Manifest Weight of the Evidence

{¶ 8} Waters' first assignment of error is as follows:

{¶ 9} THE TRIAL COURT'S DETERMINATION THAT APPELLANT IS INCOMPETENT IS CONTRARY TO THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 10} This appeal involves the understandable desire of a senior citizen to preserve as much independence as possible during her declining years.

{¶ 11} A probate court may appoint a guardian of the person of an incompetent, upon finding both incompetency, by clear and convincing evidence, and the necessity of appointing a guardian. R.C. 2111.02(A); R.C. 2111.02(C)(3). "Incompetent" is defined in R.C. 2111.01(D) as "any person who is so mentally impaired as a result of a mental or physical illness or disability, or mental retardation, or as a result of chronic substance abuse, that the person is incapable of taking proper care of the person's self or property * * * ." In the case before us, the petitioners sought, and obtained, only an order of guardianship of Waters' person, not her property.

{¶ 12} In this assignment of error, Waters contends the trial court's finding of incompetency is against the manifest weight of the evidence. The manifest-weight-of-the-evidence standard of appellate review set forth in *State v. Thompkins*, 78 Ohio St.3d 380,

678 N.E.2d 541 (1997), applies in civil cases. *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517,¶ 17-23. Under *Thompkins*:

> Weight of the evidence concerns "the inclination of the *greater amount of credible evidence*, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the *greater amount of credible evidence* sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its *effect in inducing belief*." (Emphasis added.) Black's [Law Dictionary (6 Ed.1990)], *supra,* at 1594.
>
> When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a "'thirteenth juror'" and disagrees with the fact-finder's resolution of the conflicting testimony. *Tibbs* [*v. Florida*], 457 U.S. at 42, 102 S.Ct. at 2218, 72 L.Ed.2d at 661. *See also State v. Martin* (1983), 20 Ohio App.3d 172, 175, 20 OBR 215, 219, 485 N.E.2d 717, 720-721 ("The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.").

*State v. Thompkins* at 387.

{¶ 13} We conclude that the trial court's finding of incompetency is not against the manifest weight of the evidence. For the most part, the trial court did not find Waters' testimony credible. The trial court rejected Waters' claim that the state of disarray found in her apartment in late February 2011 had been caused by her relatives, not by her. That disarray, the fact that Waters had waited for days to seek medical attention for her fractured hip, her refusal of physical therapy, and her refusals to take prescribed mental health medications because of her belief that she has been misdiagnosed, all support the trial court's conclusion that she cannot be relied upon to take proper care of herself.

{¶ 14} The trial court's finding of incompetency is also supported by the expert

evaluation of the psychiatrist, Dr. Kaneria. In that evaluation, Dr. Kaneria found impairment of Waters' orientation, speech, motor behavior, thought process, affect, memory, concentration and comprehension, and judgment. Dr. Kaneria described these impairments: "Disoriented with time and situation, garbled speech, psychomotor agitation + tremor, disorganized thoughts, labile affect, poor short term memory, poor concentration, poor comprehension, poor judgment." Dr. Kaneria checked the "no" box to the question: "Do you believe the individual is capable of caring for the individual's activities of daily living or making decisions concerning medical treatments, living arrangements and diet?" In his explanation for this answer, Dr. Kaneria wrote: "Poor self-care, limited social support, no medical card, needs rehab and physical therapy after hip surgery, but refusing ECF/Rehab. Very paranoid, would not allow assistance."

{¶ 15} Finally, the trial court considered the testimony of Waters, herself. Like the trial court, we have only a transcript of her testimony. Like the trial court, we find that some of her responses were lucid, but many were not. Some of her testimony, on direct examination, as well as on cross-examination,[6] was not responsive to the question asked, and exhibited disorientation and paranoia. In characterizing some of her responses as exhibiting paranoia, we distinguish between a testifying litigant's rational belief that her interests may be adversely affected by court proceedings, and an irrational distrustfulness of others not based on objective reality.

{¶ 16} To be sure, Waters presented some evidence from employees at Trinity Manor that she had been doing well while caring for herself during her residency there. But on this record, we conclude that the trial court could reasonably find, by clear and convincing evidence, that the contrary evidence on this subject, which was more recent, was more

---

6. Waters' cross-examination, covering just six and one-half pages of transcript, was not aggressive; it was at most mild, if not gentle.

persuasive.

{¶ 17} Finally, Waters cites *Cruzan by Cruzan v. Director, Missouri Dept. of Health*, 497 U.S. 261, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990), for the proposition that: "It is assumed, however, that Ms. Waters has the right to refuse medical treatment." We read *Cruzan* to stand for the proposition "that a *competent* person has a constitutionally protected liberty interest in refusing unwanted medical treatment * * *." *Id.* at 278. In our view, that does not preclude consideration of a persistent, irrational refusal to accept medical treatment as evidence of incompetency.

{¶ 18} We conclude that the trial court's finding of incompetency is not against the manifest weight of the evidence. Waters' first assignment of error is overruled.

**IV. The Trial Court Did Not Err in Finding that a Guardianship Is Necessary**

{¶ 19} Waters' second assignment of error is as follows:

{¶ 20} THE TRIAL COURT'S DETERMINATION THAT A GUARDIANSHIP IS NECESSARY IS IN ERROR, AS A LESS RESTRICTIVE ALTERNATIVE TO GUARDIANSHIP EXISTS.

{¶ 21} Besides finding that Waters was incompetent to care for her own person, the trial court was required to find that a guardianship of her person was necessary. In this assignment of error, Waters argues that the trial court should have found that her return to Trinity Manor was a less restrictive alternative to a guardianship of her person.

{¶ 22} The trial court rejected this argument, finding from Waters' multiple rejections of assistance that she could not be relied upon to provide for her own care if she were to return to her life at Trinity Manor, without a guardianship. For all of the reasons set forth in Part III, above, we conclude that there is competent and credible evidence to support this finding.

{¶ 23} Waters' second assignment of error is overruled.

## V. Conclusion

**{¶ 24}** Both of Waters' assignments of error having been overruled, the judgment of the trial court is affirmed.

FROELICH and HALL, JJ., concur.

(Hon. Mike Fain, Hon. Jeffrey E. Froelich, and Hon. Michael T. Hall, Second District Court of Appeals, sitting by assignment of the Chief Justice of the Supreme Court of Ohio).